659 F.2d 157
 24 Wage & Hour Cas. (BN 1144, 212 U.S.App.D.C. 111
 AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et
al., Appellants,
v.
Alan K. CAMPBELL, Chairman, U.S. Civil Service Commission, et al.
METAL TRADES DEPARTMENT, AFL-CIO, et al., Appellants,
v.
Alan K. CAMPBELL, Chairman, U.S. Civil Service Commission, et al.
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.
v.
Alan K. CAMPBELL, Chairman, U.S. Civil Service Commission,
et al., Appellants.
METAL TRADES DEPARTMENT, AFL-CIO, et al.
v.
Alan K. CAMPBELL, Chairman, U.S. Civil Service Commission,
et al., Appellants.
 Nos. 79-2024, 79-2025, 79-2136 and 79-2137.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 29, 1980.
Decided Dec. 18, 1980.
Certiorari Denied Oct.5, 1981.
See 102 S. Ct. 1030.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action Nos. 78-2270 and 79-0019).
 William J. Stone with whom James R. Rosa and Robert M. Matisoff, Washington, D. C., were on the brief, for appellants in Nos. 79-2024 and 79-2025 and cross-appellees in Nos. 79-2136 and 79-2137.
 Marc Richman, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees in Nos. 79-2024 and 79-2025 and cross-appellants in Nos. 79-2136 and 79-2137.
 Before ROBB, EDWARDS and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case involves cross appeals from a summary judgment by the District Court. In a Memorandum Opinion and Order issued on July 26, 1979, the District Court held that, except for brief periods between October 1 and October 10, 1978, wage increases payable to appellant-employees were properly limited to 5.5% under a wage "cap" in effect during fiscal year 1979. For the reasons set forth below, we hold that an appropriations bill passed by Congress in October 1978 effectively amended the prevailing rate statute covering appellant-employees to provide that their wages could not be increased by more than 5.5% in fiscal year 1979. Furthermore, because we hold that the appellant-employees had no vested statutory right to larger raises, we reverse the holding of the District Court granting increases in excess of 5.5% during certain limited periods between October 1 and October 10, 1978.
 
 I.
 
 2
 The appellants are a group of federal blue collar workers the so called "prevailing rate" employees and their unions, working in six geographical "wage areas."[1] Their pay rates are governed by 5 U.S.C. §§ 5341-5349 (1976 & Supp. III 1979) (hereinafter referred to as to "prevailing rate statute"). Section 5343, which provides a detailed scheme to set the pay rates of these workers, mandates that "(t)he pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." In order to adjust wages, a "lead agency" is designated to "conduct wage surveys, analyze wage survey data, and develop and establish appropriate wage schedules and rates for prevailing rate employees." Id. § 5343(a)(3).[2] The wage surveys are intended to aid the Government in keeping wages for federal employees roughly in line with wages paid to comparably classified employees in the private sector.
 
 
 3
 Section 5344(a) of the prevailing rate statute additionally provides that:
 
 
 4
 Each increase in rates of basic pay granted, pursuant to a wage survey, to prevailing rate employees is effective not later than the first day of the first pay period which begins on or after the 45th day, excluding Saturdays and Sundays, following the date the wage survey is ordered to be made.
 
 
 5
 Section 5344(b)(1) provides for retroactive payment of the pay increases to persons employed on the date of the issuance of the order granting the increase. These provisions, setting an effective date for wage increases and permitting retroactive pay increases to the effective date, prevent excessive agency delay from undermining the congressional intent to keep wages for governmental employees in line with wages for privately employed workers.
 
 
 6
 In July 1978, lead agencies conducted wage surveys in Dothan, Alabama; Tulsa, Oklahoma; Little Rock, Arkansas; Madison, Wisconsin; Columbus, Georgia; and Albany, Georgia.[3] In each instance the agency conducting the survey recommended a wage increase of between seven and twelve percent. The "effective dates" of the pay increases fell on either October 1 or October 8, 1978.[4]
 
 
 7
 During this same period, between July and October 1978, Congress had been working on an appropriations bill that purported to limit pay increases for federal blue collar workers, including the appellants, to 5.5%. The House and the Senate approved the bill on October 4, 1978, 124 Cong.Rec. S17,075, H11, 444 (daily ed. Oct. 4, 1978), and the President signed the bill into law on October 10,[5] shortly after the "effective dates" of the appellants' wage increases.[6]
 
 
 8
 In anticipation of the passage of the appropriations bill capping federal blue collar wage increases, none of the agencies employing the appellants had issued orders implementing increases before the bill was signed into law, even though the effective dates for wage increases had passed. Consequently, by October 10, the agencies had not determined the actual wage increases to be given under section 5343. On October 20, the Civil Service Commission[7] issued a bulletin notifying federal agencies that pay increases granted pursuant to wage surveys, with an effective date of October 1 or later, were subject to the 5.5% limitation. See CSC Bulletin 532-30, reprinted in J.A. at 35.[8] The agencies in this case then issued wage schedules granting increases of 5.5%, to be paid retroactively to the "effective dates" of the wage increases.
 
 
 9
 The appellants sued to enforce their alleged rights to wage increases based solely on the wage surveys under the prevailing rate statute. On cross motions for summary judgment, the District Court held that the appellants had a "vested statutory right to receive the full amount of the survey determined wage increases (from the effective date of the increase) until October 10, 1978 when the President signed the pay cap into law." American Fed'n of Gov't Employees v. Campbell, 474 F.Supp. 357, 359 (D.D.C.1979) (footnote omitted). The District Court found that the workers' statutory right to wage survey increases had vested on the "effective date" of the wage surveys, but that "Congress has the authority to reduce the pay of the (appellants) prospectively without interfering with any of their Constitutional rights." Id. at 360. The District Court thus held that the appellants' wage increases were properly reduced to 5.5% after October 10. Both sides have appealed.
 
 
 10
 Because we find that the appellants did not have a vested statutory right to any wage increases until their agencies issued orders granting increases, and because no such orders were issued until after the passage of the limiting appropriations bill, we hold that the appellants were entitled to no increase in wages above the 5.5% limit set by Congress.
 
 II.
 
 11
 The appellants set forth two principal arguments in support of their claim. First, they contend that it is not possible to discern a sufficiently clear congressional intent in the October 10 appropriations bill to amend pro tanto the wage statute for prevailing rate employees. From this purported lack of clear intent, the appellants conclude that the appropriations bill cannot be construed to require a reduction in their statutorily mandated wage increases. Alternatively, the appellants argue that their statutory right to wage increases based on wage surveys under the prevailing rate statute vested on the "effective dates." Therefore, appellants urge that Congress could not lawfully deprive them of these alleged vested wage increases.
 
 III.
 
 12
 In their first argument the appellants contend that the Government has not met its burden of showing that Congress intended the appropriations bill to repeal the prevailing rate statute for prevailing rate employees. They argue that the case law requires a clearer showing of congressional intent than that manifested in the bill.
 
 
 13
 The cases cited by appellants do not fully support their argument. For example, the appellants rely upon Tennessee Valley Auth. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), for the proposition that repeals by implication, especially in appropriations bills, are not favored. While this bare statement of the law is undoubtedly correct, the facts in Hill present a different picture of congressional intent than the facts in the present case. In Hill the Supreme Court soundly rejected the argument that continued congressional funding of the Tellico Dam whose construction threatened the survival of the snail darter demonstrated that Congress must have meant, by implication, to repeal the Endangered Species Act, at least as it applied to that dam. See id. at 189-91, 98 S.Ct. at 2299-2300.[9] In the present case, by contrast, the Government does not claim that Congress has repealed a substantive act by appropriating money for projects that might violate the act. Instead, Congress acted to amend pro tanto the substantive prevailing rate law by specific reference to that law. The "prevailing rate" scheme remained in effect, albeit with an upper limit to the percentage that wages might be increased during fiscal year 1979.
 
 
 14
 Stronger support for the appellants' position can be found in United States v. Langston, 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164 (1886). In that case a federal law provided that the American representative to Haiti would be paid $7,500 per year. When Congress appropriated only $5,000 for the representative's salary, he sued to recover the difference. The Supreme Court affirmed a judgment in his favor, holding that it could not discern any clear congressional intent to repeal the original statute setting the representative's salary. In reaching this result, the Court ruled that
 
 
 15
 a statute fixing the annual salary of a public officer at a named sum, without limitation as to time, should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the service of that officer for particular fiscal years, and which contained no words that expressly or by clear implication modified or repealed the previous law.
 
 
 16
 Id. at 394, 6 S.Ct. at 1187.
 
 
 17
 In Langston, the appropriations bill, which had the effect of reducing the representative's salary, contained no reference to the earlier statute. In the present case, by contrast, the appropriations bill expressly limited wage increases to 5.5% for those workers whose pay is subject to adjustment "under ... (3) section 5343 of Title 5 ..., if such adjustment is granted pursuant to a wage survey." The present case is thus plainly distinguishable from Langston precisely because of the direct and explicit reference to the statutory scheme that set wages based on wage area surveys.[10] Unlike the statute in Langston, the bill in this case contains words that by clear implication, if not express statement, modified pro tanto the previous substantive law. Consequently, we conclude that Congress, by express reference to the earlier statute, effectively modified the prevailing rate statute to provide that wages for prevailing rate employees could not be increased by more than 5.5% for fiscal year 1979.
 
 IV.
 
 18
 The question remaining before this court is whether the appellants had any vested statutory rights to uncapped wage increases. Appellants argue that on the "effective dates" of their wage increases, they acquired statutory entitlements to the wage increases derived from the wage surveys. They contend that any subsequent congressional action depriving them of their statutorily mandated wage increases would have infringed their constitutional rights.
 
 
 19
 One premise of appellants' argument is that the prevailing rate statute leaves agency officials virtually no discretion in setting wage increases. Once the wage surveys have been analyzed, agency officials must according to appellants order wage increases that will put federal blue collar wages in line with wages paid to privately employed workers. As a corollary to this argument, appellants concede that they could have made no claim to any vested rights if the limiting appropriations bill had been signed into law before the effective dates of the wage increases under the prevailing rate statute.
 
 
 20
 The Government argues that the public interest provisions[11] of the prevailing rate statute give agency officials broad discretion to order pay increases different from those suggested by the wage surveys. According to the Government, the wage surveys only serve to recommend the appropriate limits for various wage increases. The Government thus argues that the appropriations bill is entirely consistent with the prevailing rate statute in that it simply defines, for fiscal year 1979, what the public interest required. Furthermore, the Government contends that the agencies could have acted to limit wage increases for fiscal year 1979, under the public interest provisions of the prevailing rate statute, without reference to or reliance upon the appropriations bill.
 
 
 21
 When the positions of the parties are joined, several difficult questions are posed. One question focuses on appellants' claim that they suffered an infringement of constitutional right if Congress acted to divest them of wage increases that were given pursuant to the prevailing rate statute.[12] Another question focuses on issues of statutory interpretation, concerning in particular the scope of an agency's authority under the public interest provisions of the prevailing rate statute to set wage increases different from those indicated by the statutory wage surveys.
 
 
 22
 Under the circumstances of this case, it is unnecessary for us to address these potentially troublesome questions. Before we consider whether Congress acted to divest appellants of wages claimed due under the prevailing rate statute, or whether the Government agencies have discretion to "cap" appellants' wage increases pursuant to the public interest provisions, we must first determine whether appellants did indeed have any vested rights to assert.[13] Since, for the reasons noted below, we find that the limiting appropriations bill was signed into law before appellants had acquired any rights to wage increases under the prevailing rate statute, we find it unnecessary to reach the additional questions raised by this appeal.
 
 
 23
 The simple question to be addressed here is whether appellants' rights to wage increases vested on the "effective date" or the "operative date" under the prevailing rate statute. The "operative date" is the date on which the agency actually issues an order setting the amount of the wage increase, and it may come either before or after the effective date. Should it come later, as it did in this case, wage increases are to be paid retroactively to the effective date. The effective date and retroactivity provisions in section 5344 of the prevailing rate statute guarantee workers the benefit of their pay increases even though their agency has delayed in issuing an order implementing the raise. However, we reject appellants' claim that workers acquire an entitlement to an undetermined raise on the effective date.[14]
 
 
 24
 Support for this conclusion can be found in House and Senate reports on the bill adding the "effective date" provision to the prevailing rate statute. For example, in H.R.Rep.No.2207, 85th Cong., 2d Sess. (1958), a House committee reporting favorably on S. 25[15] expressed concern that "(t)his long period (in conducting wage surveys and analyzing the data) results in the Federal employee receiving an increase in wages some 5 to 8 months following a similar increase in wages of employees in private industry." The House committee report indicated that:
 
 
 25
 The provisions of bill S. 25 as reported will bring the wages of the Federal employee more closely in alignement with those being paid in private industry and will tend to keep them from lagging too far behind at any time.
 
 
 26
 Id. at 2. The House committee report does not describe the effective date as anything more than a device to protect blue collar wages from "(t)he almost complete lack of efficiency in planning, programming, and conduct of wage surveys." Id.[16]
 
 
 27
 Our conclusion that the appellants had no vested rights to wage increases until the "operative date" is further supported by reference to the "public interest" clauses in the prevailing rate statute. Section 5341 provides that:
 
 
 28
 It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates.
 
 
 29
 (emphasis added). Section 5343(a) repeats this language nearly verbatim. Despite these references to the "public interest," counsel for appellants argued that the duty of agency officials is merely ministerial once the wage survey data have been analyzed. According to appellants, the public interest provisions allow "very little room" for adjustment, limiting agency discretion to "rounding off figures." Thus, appellants assert that wage increases must be based only on wage surveys under the prevailing rate statute.
 
 
 30
 While we need not decide the scope of the discretion available to agency officials under the public interest clauses, we conclude that the scope is greater than the appellants would permit. To give the public interest clauses the narrow meaning suggested by appellants would render superfluous these two statutory provisions, something that we cannot do. Thus, whatever interpretation is to be attributed to the public interest clause, it surely provides agency officials with some flexibility in setting wage increases. Because agency officials have some discretion, it follows that blue collar wages cannot be fixed until the agency issues an implementing order on the operative date. Only when the agency fixes and orders a raise do workers acquire a vested right to that raise.
 
 
 31
 In light of these findings, it must be held that appellants acquire a vested right to an actual wage increase only when the agency issues an order fixing the increase. Because the agencies in this case never issued orders setting new wage rates for the appellants until after Congress had acted to amend pro tanto the prevailing rate statute, the appellants never acquired a statutory entitlement to specific wage increases based solely on wage survey data. Consequently, the intervening appropriations bill, capping wage increases, did not divest the appellants of any existing rights.[17]
 
 V.
 
 32
 We conclude that the appropriations bill effectively capped federal blue collar wages for fiscal year 1979. Furthermore, because the workers acquire no vested rights until the operative date, when wage increases are actually ordered, and because no such orders had issued in this case, the appropriations bill did not divest the appellants of any rights. Accordingly, we affirm the District Court decision insofar as it holds that federal blue collar wages were capped after October 10; however, we reverse the decision of the District Court insofar as it holds that appellants had a vested right to uncapped wage increases between the effective dates and the date when the appropriations bill was signed into law.
 
 
 33
 So ordered.
 
 
 
 [1]
 Although both the Government and the employees have appealed the District Court decision, the employees won only a minor portion of their claims. Consequently, in this opinion we refer to the employees as the appellants
 
 
 [2]
 The statute also provides that:
 The Office of Personnel Management shall schedule full-scale wage surveys every 2 years and shall schedule interim surveys to be conducted between each 2 consecutive full-scale wage surveys. The Office may schedule more frequent surveys when conditions so suggest.
 Id. § 5343(b).
 
 
 [3]
 The pay rates of blue collar employees located in other wage survey areas, as well as all general schedule (white collar) employees, are not in dispute
 The Defense Department was the lead agency in each city but Madison, where the Veterans Administration was the lead agency.
 
 
 [4]
 The effective date for all appellants was October 8, except for those working in Dothan, for whom the effective date was October 1
 
 
 [5]
 See Pub.L.No.95-429, 92 Stat. 1001 (1978)
 
 
 [6]
 Section 614(a) of the appropriations bill provides:
 No ... funds appropriated for the fiscal year (beginning October 1, 1978 and) ending September 30, 1979, ... may be used to pay the salary or pay of any individual ... in an amount which exceeds the rate ... payable ... on September 30, 1978, by more than 5.5 percent, as a result of any adjustments which take effect during such fiscal year under
 (3) section 5343 of Title 5 ..., if such adjustment is granted pursuant to a wage survey (but only with respect to prevailing rate employees described in section 5342(a)(2)(A) of that Title).
 
 
 [7]
 On January 1, 1979, the Civil Service Commission was replaced in part by the Office of Personnel Management. See Reorganization Plan No. 2 of 1978, 43 Fed.Reg. 36,037 (1978)
 
 
 [8]
 "J.A." refers to the Joint Appendix submitted by the parties
 
 
 [9]
 It is significant to the holding in Hill that the appropriations bills for the Tellico Dam made no reference to the Endangered Species Act. In this case, the prevailing rate statute is referred to specifically in the limiting appropriations bill. See note 6, supra
 
 
 [10]
 The appellants also seek support in New York Airways, Inc. v. United States, 369 F.2d 743 (Ct.Cl.1966), where the Court of Claims held that "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." Id. at 748. Of course, in the present case we have no mere failure to appropriate funds. Rather, Congress specifically set a ceiling on wage increases, and directly referred to the prevailing rate statute as one of the substantive statutes affected by the appropriations bill. As the Court of Claims acknowledged in its opinion in New York Airways: "(a)s a general proposition Congress has the power to amend substantive legislation for a particular year by an appropriation act." Id. at 749
 
 
 [11]
 See 5 U.S.C. §§ 5341, 5343(a)
 
 
 [12]
 Appellants have argued that "the federal Government cannot constitutionally diminish its employees' entitlement to survey-determined wage increases, once vested, during the one-year period subsequent to the effective dates of the wage increases." Appellants' brief at 27. In support of this point, appellants primarily rely on United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) and Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), although they recognize that the decision in Larionoff was "not based on constitutional grounds." Appellants' brief at 30
 
 
 [13]
 It must be recalled that appellants have properly conceded that they could have made no claim if the limiting appropriations bill had been signed into law before their asserted rights had vested under the prevailing rate statute
 
 
 [14]
 We stress that our conclusion on this issue is limited to a construction of the particular terms of the prevailing rate statute. We offer no opinion as to the meaning of these concepts in any other federal statute or governmental compensation program
 
 
 [15]
 S. 25 established "an effective date on which increases in wages resulting from wage surveys of local prevailing rates are to be paid to Federal employees." Id. at 1. The House committee amended S. 25 to set 45, instead of 60, workdays after the wage survey is ordered as the effective date of the increase. This provision was substantially reenacted when Congress amended the prevailing rate statute in 1972. See Pub.L.No.92-392, 86 Stat. 564 (1972)
 
 
 [16]
 See also S.Rep.No.382, 85th Cong., 1st Sess. (1957). See Pub.L.No.85-872, § 1, 72 Stat. 1696 (1958)
 
 
 [17]
 Because of our holdings in this case, it is unnecessary for us to determine the meaning of the "public interest" provisions in §§ 5341 and 5343(a) of the prevailing rate statute. Our judgment on this issue must await our decision in the companion cases of National Fed'n of Federal Employees, Local 1622 v. Brown, No. 79-2394 and American Fed'n of Gov't Employees v. Brown, No. 80-1092, both of which were argued, along with this case, on October 29, 1980